FILED
CLERK, U.S. DISTRICT COURT

OCT 2 5 2010

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

1   **LAW OFFICES OF GEORGE A. SHOHET,**
2   **A PROFESSIONAL CORPORATION**
    George A. Shohet (SBN 112697)
3   245 Main Street, Suite 310
4   Venice, CA 90291-5216
    Telephone: (310) 452-3176
5   Facsimile:  (310) 452-2270

6   **KREINDLER & KREINDLER LLP**
7   Gretchen M. Nelson (SBN 112566)
8   Jacob Mensch (SBN 268006)
    707 Wilshire Blvd, Suite 4100
9   Los Angeles, CA 90017
10  Tel.: (213) 622-6469
    Fax: (213) 622-6019
11

12  Attorneys for Plaintiff
    Southern California Institute of Law
13

14              **UNITED STATES DISTRICT COURT**
15
16          **CENTRAL DISTRICT OF CALIFORNIA**

17  SOUTHERN CALIFORNIA            CASE NO.:**CV10-8026** PSG
18  INSTITUTE OF LAW, a California                        (AJW)
    corporation,
19                                 **COMPLAINT FOR INJUNCTIVE**
20          Plaintiff,             **RELIEF AND DAMAGES**

21              vs.
                                   **JURY TRIAL DEMANDED**
22  TCS EDUCATION SYSTEM, an
23  Illinois corporation;  DAVID J.
    FIGULI, an individual; GLOBAL
24  EQUITIES, LTD. d/b/a HIGHER
25  EDUCATION GROUP, a Colorado
    limited liability company,
26
            Defendants.
27

28

_____
           COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

Plaintiff, by and through its attorneys, based on its experiences, the investigation of counsel, and its information and belief, alleges as follows:

## NATURE OF THE CASE

1.     This action arises out of the blatantly anticompetitive conduct of TCS Education System, a multi-million dollar corporation engaged in the rapid acquisition of schools and colleges in California and elsewhere.  Plaintiff is a small, State-Bar accredited, evening law school with a twenty-five year history of serving working class adults in the tri-county area of San Luis Obispo, Santa Barbara and Ventura Counties.  Lured by the prospect of increasing its outreach to an underserved population of future law students, the plaintiff provided defendants with unfettered access to its Dean, faculty and confidential files in an effort to complete an acquisition transaction with the defendants.  Instead, the defendants misappropriated plaintiff's most guarded secrets and information in violation of a binding confidentiality agreement and secretly used the information to affiliate with the plaintiff's sole competitor in the region.  Armed with the stolen information, the defendants recently announced their "deal" which is calculated to kill off competition in the region, destroy the plaintiff's business and increase the cost of tuition.  Plaintiff seeks as its primary remedy preliminary and permanent injunctive relief prohibiting defendants from taking further steps to complete their unlawful scheme.

## JURISDICTION AND VENUE

2.     This Court has subject matter jurisdiction over these claims pursuant to 15 U.S.C. § 4 and 28 U.S.C. § 1331.  In addition to the claims alleged herein that arise under federal law, the Court has jurisdiction over plaintiff's state law claims under 28 U.S.C. § 1332(a) (because the parties are diverse and the amount in controversy exceeds $75,000, exclusive of interest and costs) and/or 28 U.S.C. § 1367(a) (because those claims are so related to the federal claims that they form part of the same case or controversy).  Venue is proper in this District under 28 U.S.C. § 1391 because defendants conduct business in this district and transacted

with plaintiff in this District.  In addition, wrongful conduct by defendants took place in this District, and that conduct was intended to and did cause injury to plaintiff.

### THE PARTIES

3.      Southern California Institute of Law (the "Law School") is a California corporation founded in 1986 with campuses in Santa Barbara and Ventura Counties.  The Law School operates evening programs for the benefit of working adults who seek a rigorous academic environment that is affordable, flexible and offers small class sizes.  Because of its dedicated administration and faculty, who receive very modest compensation, perhaps the lowest of any State Bar accredited school in California, the Law School maintains one of the lowest tuition rates among law schools in the state.  Tuition rates are currently $350 per unit whereas many comparable law schools charge in the range of $800 or more per unit.  Santa Barbara & Ventura Colleges of Law ("COL"), the only other law school in the tri-county area of San Luis Obispo, Santa Barbara and Ventura Counties, charges $450 per unit.  In 1996, after a decade of tremendous effort, the Law School was accredited by the Committee of Bar Examiners for the State of California.   To put this accomplishment into perspective, there has been only one other California law school that received State Bar accreditation in the past 25 years.  That school was founded in 1927 and only received its accreditation this year.  Currently, students may earn Juris Doctor ("J.D.") and Bachelor of Science in Laws degrees.  The Law School is also accredited by the California Bureau of Private Postsecondary Education ("Bureau") and was approved by the Bureau to commence a paralegal program and Bachelor of Arts programs in Law Enforcement and Criminal Justice.   In evening law schools, nearly all of the academic experience takes place in the classroom.  Recognizing this fact, the Law School continuously re-evaluates and tests its teaching methodologies.

4.      There are approximately one hundred students between the two campuses, thirty-one distinguished faculty members and an administrative staff

consisting of a Dean, Vice-Dean and Registrar.  The Law School's seven-person Board of Directors has four members with Ph.D.s, three with J.D.s, two with M.B.A.s and five members hold multiple post-graduate degrees.  Dean Stanislaus Pulle has a Ph.D. from King's College, University of London and was a post-doctoral Visiting Scholar at Yale Law School.  He has taught for over forty years, including serving on the faculty of San Fernando Valley College of Law, COL, where he also served as Academic Dean, and at the Law School where he still teaches Constitutional Law.  Dean Pulle founded the Law School with Dr. Carroll Gambrell, Board Chair, a former Dean of the School of Engineering at Mercer University, and Desmond O'Neill, Vice Dean, who holds an M.A. from the University of California, Santa Barbara, a J.D. from Boalt Hall School of Law and was twice president of the Santa Barbara County Bar Association.  Members of the Law School's faculty have been rated as "superior" to "excellent" by State Bar Accreditation Consultants.  Its faculty is drawn from top drawer law schools accredited by the American Bar Association ("ABA") who themselves excelled while in law school and from valedictorian law graduates of California accredited law schools.   Over the past twenty-five years, the Law School has fostered a community among current students, alumni, faculty and staff.   Leaders in the field of law have taken note of the high quality academics provided, the educational opportunities created for the working class and the overall positive community impact the Law School makes.  Past keynote speakers at the Law School's commencement ceremonies include California Supreme Court Justice Ming Chin, presiding Justices of various divisions of the California Court of Appeal, including Justice Norman L. Epstein and Justice Paul Turner, former State Attorney General Bill Lockyer , Kenneth A. Starr, former United States Solicitor General, past Pepperdine University Law School Dean and current President of Baylor University, the governing president of the International Criminal Court, presiding judges of the local Superior Courts in Santa Barbara and Ventura, a President of the State Bar of California and members of the California legislature. The Law

COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

School is honored to have as its keynote speaker at the June 2011 graduation ceremony California Supreme Court Chief Justice designee Tani Cantil-Sakauye.

5.      Defendant TCS Education System ("TCS") is a private, not-for-profit, corporation organized under the laws of the State of Illinois with its corporate headquarters in Chicago.  Rather than being a comprehensive university, TCS acquires or affiliates with specialized colleges with discrete professional disciplines.  For non-profit schools and colleges, TCS creates *affiliations* because these institutions do not have an ownership structure like proprietary entities. Prior to its affiliation with COL, the TCS "system" included schools with disciplines in psychology, health and human services, and education; a foundation that provides support for the schools and colleges; an online services affiliate that assists the schools with developing and offering online coursework; and two preschool through eighth grade laboratory schools.   According to its 2010 Annual Report, TCS affiliates had revenues of approximately $71.8 million and net assets in excess of $30 million.  It has a corporate staff of approximately 175 people and hundreds more faculty and staff at its various schools and colleges.  One of its institutions, The Chicago School of Professional Psychology, has 500 employees alone.  There are over 4,000 students at TCS-affiliated campuses in Chicago, Washington, D.C., Los Angeles, Irvine, Pasadena, Santa Barbara and elsewhere. Although TCS is a non-profit, it prides itself on its innovative business structure and financial success.  In many respects it operates more like a "for profit" business with a focus on market-oriented activity and sees itself as well poised to fill the void created by the cutbacks and lower enrollment in public higher education.   TCS's "business model" is "built on the premise that business success and social impact need not be mutually exclusive" and it seeks to "[o]perat[e] as an effective, financially-sound, and fast-growing business," with a goal of "deliver[ing] truly significant returns for donors, investors, students, communities, and the world at large."   The 2010 TCS Annual Report proclaims: "A rapidly changing and increasingly complex external environment—fueled by economic

uncertainties, changing student demographics, and mounting competition—has created new challenges for traditional higher education.  Institutions have met with varying success in confronting these obstacles, some closing their doors, reducing services, or trimming programs and faculty ranks.  Meanwhile, TCS Education System has crafted a business model that is intrinsically adaptive and that responds to today's realities, relying for growth and viability on a formula based on size, focus, diversification, and impact."  TCS woos the colleges and schools it targets with the promise of business acumen, financial support and other tempting resources.  Its dual "bottom-line" is "social impact" and "sophisticated business practices."  TCS CEO Michael Horowitz recently elaborated on TCS's business strategy, stating in an interview:

> Smaller institutions cannot get the technology, or fundraising, or administrative infrastructure that's required to be effective today. They may have to affiliate with a system like ours, or they are going to be acquired, bought by for-profits, or even go out of business....

> [B]ecause the model is small, focused institutions, we can share resources more effectively.  So even with respect to traditional fundraising, we have a foundation for grants, and philanthropy.  We are sharing that among a number of colleges and schools because it is more efficient than duplicating that for each small college.  So part of the model is to think creatively about resources and deploy them more effectively across institutions, so that we can direct more resources toward the core educational activity.  Similarly, we've set up structures that in the future will allow investors to invest in projects that we couldn't do on our own, but require capital to expand and make the educational experience more excellent.  That should allow us to take on new projects, and also not just to rely on tuition dollars.  So between philanthropy, the potential for investor dollars, and

COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

tuition, we create a much more energetic and dynamic base for funding.

(For the complete interview: www.tcsedsystem.org/?page=AnnualReport).

6.     Defendant David J. Figuli ("Figuli") is a Colorado-based attorney with his principal place of residence in Evergreen, Colorado, a part of Jefferson County. On his law firm's Website, Figuli portrays himself as a leading lawyer in the "American higher education industry." *See* www.figulilawgroup.com.  He claims to have worked with hundreds of colleges, universities, educational associations, and education investment and management companies in his 33-year career.  He previously served as General Counsel for the South Dakota Board of Regents and Chief Legal Counsel for the Montana University System.  He also served as general counsel to several major universities and as a trustee for three colleges.  He claims to be an expert in accreditation, licensing and regulatory matters, including those relating to federal financial aid programs, and a recognized writer and lecturer on higher education management and faculty employment matters.  In his biography, he states that he has conducted seminars and keynote addresses for most of the major associations in American higher education including the American Council on Education, the American Association of State Colleges and Universities, the National Association of College and University Business Officers and the National Association of Student Financial Aid Administrators.  Like TCS, Figuli sees himself as an innovator in the development of new business models for higher education, including strategic alliances, sponsorship arrangements, public/private and nonprofit/for profit ventures, international partnerships, mergers and acquisitions and investment relations.  He offers his clients the following array of services, among others:

(i) transactional services that include assistance in negotiating and drafting conceptual documents, facilitating changes in corporate structure to achieve growth, raising capital, selling assets, divisions or equity, compliance with

7

regulatory requirements, formation of systems, conversions of a legal entity from one type to another, and redistribution of assets among various entities;

(ii) preparation and presenting applications for substantive change to institutional accrediting agencies and presenting changes of control to state licensing bodies and the U.S Department of Education ("DOE");

(iii) conceptualizing, forming and executing affiliations between tax-exempt entities, public and -private entities and non-profit and for profit enterprises with the goal of ensuring that tax-exempt status is not compromised and the appropriate level of control is created to satisfy institutional accrediting agencies;

(iv) providing legal and business advice to educational institutions and investors desirous of forming domestic and international ventures that combine core competencies, educational assets, investment capital, expertise and/or specialized services to achieve common goals with an emphasis on deal structuring, regulatory compliance and risk management; and

(v) conducting due diligence investigations in a wide range of transaction settings, ranging from the simple to complex and involving for-profit and nonprofit institutions and organizations engaged in all aspects of the post-secondary sector. Such services include "comprehensive investigation of corporate structures, litigation, contractual relationships, Title IV compliance [i.e., federally funded student financial aid programs], accreditation compliance, employment practices, faculty related issues, intellectual property, and owned and leased property. We investigate all potentially relevant and material aspects of a transacting party's business, compel all necessary disclosure, and recommend third-party investigations and reports as well as further action based upon our findings."

7.      Defendant Global Equities, Ltd. ("Global Equities") is a Colorado limited liability company with its principal place of business in Evergreen, Colorado, which is part of Jefferson County.  It also maintains a mailing address in Conifer, Colorado.  Global Equities is owned and controlled by Figuli and transacts business under the trade name "Higher Education Group".   For

COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

convenience, Global Equities is referred to herein as "HEG."  Figuli identifies himself as "CEO" of HEG.  According to its Certificate of Assumed or Trade Name filed with Secretary of State for Colorado, HEG provides: "Consulting services to post-secondary educational institutions and associations; sale of products or services to the post-secondary educational market; training programs and materials for the post-secondary educational market".  TCS retains Figuli and HEG to assist it in targeting potential acquisitions or affiliations with schools and colleges and structuring its deals.

## FACTUAL BACKGROUND

8.     Prior to 1986, COL was the only law school in the tri-county region spanning San Luis Obispo, Santa Barbara, and Ventura Counties.  At that time, the only other State Bar accredited schools were miles away in either Monterey or Malibu.  Neither of these options made sense for working adults, many of whom were single parents.  Like the Law School, COL offers a part-time evening curriculum leading to a J.D. and is State Bar accredited.  Neither the Law School nor COL is ABA accredited.  In addition, neither school has accreditation from the Western Association of Schools and Colleges ("WASC").  Without these accreditations, neither the Law School nor COL can offer students federally funded loans.  The chief reasons why these other accreditations cannot be sought and obtained is the lack of financial and human resources that would allow the Law School or COL to meet basic eligibility criteria.

9.     For smaller institutions like the Law School and COL, obtaining ABA accreditation is too arduous and expensive a process to even consider.  Obtaining WASC accreditation, while more feasible in theory, is still out of reach because the process consumes too many scarce resources.  That is why no non-ABA accredited law school has WASC accreditation in Southern California.

10.     WASC's Accrediting Commission for Senior Colleges and Universities (the "Commission") is responsible for the evaluation of the quality and effectiveness of colleges and universities offering the baccalaureate degree and

above in California, Hawaii, Guam and the Pacific Basin.  Voluntary, non-governmental, institutional accreditation, as practiced by WASC and other regional commissions, is a unique characteristic of American education.  Accreditation is granted at the completion of a peer review process, and assures the educational community, the general public, and other organizations that an accredited institution has met high standards of quality and effectiveness.  While no institution in the United States is required to seek accreditation, it is highly coveted both in terms of institutional stature and the ability to qualify students for federally funded student loans under Title IV of the Higher Education Act.  WASC is reviewed periodically by the DOE and the Commission is also periodically reviewed by the Council for Higher Education Accreditation.

11.     Achieving WASC accreditation requires an applicant to endure a three-phase process costing tens of thousands of dollars or more and spanning as much as four years.  WASC requires that any institution that it considers meet twenty-three eligibility criteria to achieve preliminary consideration for accreditation.   The applicant must satisfy requirements such as showing that it has core faculty whose primary responsibility is to the institution, an adequate funding base and financial resources to ensure sustainability, and annual audits by a certified public accounting firm with two years of audited financial statements readily available.   The next phase of WASC accreditation requires the institution to pay fees to cover WASC's site inspections, including travel, hotel and meal expenses of its visiting team members, any legal fees WASC incurs, and other expenses during this evaluative process.  This second phase could cost a school the size of the Law School $20,000 or more.  The last phase occurs when the institution is granted the status of being a candidate and seeks initial accreditation.  This phase can take two or three years according to WASC's Procedures Manual and the cost could easily exceed another $20,000 for a school like the Law School.  The applicant must demonstrate compliance with WASC's formal Standards of Accreditation ("Standards").  The Standards cover all financial, organizational, and

operational aspects of an institution and require the institution to show that it has or will meet numerous criteria and guidelines.  Prior to initial accreditation, a multi-level review process ensues with the candidate institution preparing detailed written reports, receiving feedback from WASC committees and team members, responding to any evaluative concerns, undergoing several more site visits, and demonstrating that it meets both capacity and educational effectiveness standards. Like other aspiring institutions, the Law School contemplated a day when it might marshal sufficient resources to seek accreditation from WASC.

12.    Over the past twenty-five years, the Law School and COL have competed for students and faculty.  COL is much larger than the Law School and has approximately 250 students, thirty-seven faculty members and an administrative staff of nine.  In spite of the fact that COL is larger and has more resources, the Law School established a strong presence in the tri-county region because of its willingness to keep tuition costs low while maintaining a strong faculty and academic program.  This commitment has allowed many current and past students to afford to earn a law degree.  The Law School has had a number of students who transferred in good academic standing from COL, citing the lower cost of tuition as a key factor.  In the past three years, the few commercial banks like Wells Fargo and Bank of America that were willing to provide loans to students have ceased doing so.  As a result, the Law School's commitment to maintaining low tuition costs is more important than ever.  With a population of over five million people in the tri-county region, the loss of the Law School as a community resource would be tragic.

13.    In mid-September 2009, Dean Pulle was approached by Figuli and George R. Haynes ("Haynes"), the former Vice President of Academic Affairs for the Santa Barbara Graduate Institute of Psychology (the "Institute"), regarding a potential acquisition by TCS.  The Institute had just become affiliated with TCS on or about July 15, 2009, and Haynes, as a local educator and school administrator, made the introduction.  The Institute was motivated in part to engage in the

affiliation due to the prospect of achieving WASC accreditation and gaining access to federal student loans.  Figuli and Haynes explained that TCS was interested in acquiring a California law school.  Dean Pulle and his colleagues at the Law School were told by Figuli and Haynes that they and HEG were authorized to act on behalf of TCS as its agents and advisors.   Figuli stated that he had extensive background in strategic acquisitions in the education sector and that, through defendant HEG, he had been assisting TCS with identifying suitable acquisition candidates and structuring transactions.  Figuli represented to Dean Pulle that he had facilitated the recent TCS affiliation with the Institute.

14.     Dean Pulle shared with Figuli and Haynes that the Law School was approached in 2007 by a large university about a potential acquisition, but during the course of those discussions, the university experienced certain financial challenges and the discussions ended.  Dean Pulle told Figuli and Haynes that he was encouraged by the prospect of an acquisition with TCS because it would allow the Law School to seek regional WASC accreditation, increase enrollment, establish new programs, extend educational opportunities to foreign students and leverage existing resources, such as using one or both of the school's campuses for daytime programs.  From the outset, Figuli, Haynes and TCS knew that there were two State-Bar accredited law schools in the tri-county area, but Figuli stated that TCS was very interested in pursuing an acquisition of the Law School.

15.     Dean Pulle represented to Figuli and Haynes that an integral part of the school's mission was to serve low and moderate income working adults and keep the total cost of the J.D. program in the range of $30,000.00 over the course of the typical four year term.  Further, Dean Pulle emphasized the commitment by his Board and faculty to reduce law school earnings if necessary to ensure that the program would remain affordable and accessible.  Dean Pulle made it clear to Figuli and Haynes that the Law School was not interested in an affiliation if that would change the school's core mission or values, which included a focus on rigorous academic standards.  As proof of the success of its approach, Dean Pulle

COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

emphasized the Law School's increasing profile in the community as a high quality law degree program, its outstanding faculty and Board members and the many notable keynote speakers at its graduation ceremonies.  Figuli agreed to the parameters set by the Law School.

16.    On September 24, 2009, the Law School and TCS entered into a Confidentiality and Non-Disclosure Agreement ("NDA").  The NDA was prepared by TCS.  Dean Pulle executed the NDA on behalf of the Law School.  Jeff Keith ("Keith"), Senior Vice President of Finance and Administration and Chief Financial Officer for TCS, executed the NDA on behalf of TCS.  Keith previously served as the vice president of finance and the chief financial officer for The Chicago School of Professional Psychology, which with more than 3,000 students is TCS's largest higher education affiliate.  At TCS, Keith is responsible for finance and accounting, technology, human resources, real estate, online operations, mergers and acquisitions, legal affairs, and strategy.  A copy of the NDA is attached hereto as Exhibit 1.

17.    The preamble to the NDA states that the Law School was to provide "access to proprietary, trade secret and confidential information..., which may include, without limiting the generality of the foregoing, strategies and strategic plans, business opportunities, business plans, financial reports, statements and projections, trade names and marks, documents, programs, techniques, know-how, and specifications...."  The NDA referred to the collective of the confidential and proprietary information, both orally conveyed and in documentary form, as "Information".   The Information was to remain the property of the Law School and used solely for the purpose of "facilitating a transaction" between TCS and the Law School which the NDA referred to as "the 'Relationship'".   NDA, preamble and ¶1.  TCS, its employees and agents were commanded "not to use, reproduce, or directly or indirectly disclose or allow access to the [I]nformation except as required to facilitate the *Relationship*."  *Id.* (emphasis added). To alleviate any

COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

lingering concerns the Law School might have regarding the release of its Information to TCS, the NDA took the extraordinary step of mandating that:

> "[TCS] shall protect the confidentiality of the Information from the date of its receipt hereunder with ***at least the same diligence and care as would be required of [TCS] if it were a fiduciary of the [Law School], that is the utmost good faith and care for the interests of the [Law School]***." *Id.* ¶2 (emphasis added).

18.    TCS faithfully promised that it would not use the Information the Law School provided to "pursu[e] business opportunities or other arrangements or endeavors of any kind" in violation of the NDA. *Id.* ¶10.  This non-competition covenant is proper because, *inter alia*, it is intended to prevent TCS from competing with the Law School after receiving the school's confidential Information.  The NDA is governed by California law and "continue[s] until such time as any Information received by [TCS] hereunder is returned to the [Law School] or destroyed." *Id.* ¶7.

19.    Figuli and TCS led the Law School to believe that TCS would be its strong ally and enable the Law School to compete against the larger, and better funded, COL.  The manner in which an alliance with TCS would enable the Law School to grow and successfully compete with COL was discussed in great detail during September, October and November 2009.  At no point during any of these discussions did Figuli or TCS suggest that the price the Law School had proposed was unreasonable or unacceptable.  Instead, the discussions focused on marketing strategies, addition of new degree programs, initiation of internet based instruction, the use of TCS's WASC-accreditation and the corresponding ability to offer federally funded tuition loans to attract new students and other plans.  In addition, issues of governance, structures of control, methods of securing expanded accreditation, and curriculum expansion were addressed.

20.    Confident that it was working toward an acquisition, in early October 2009, the Law School released its most guarded Information to Figuli, HEG and

TCS.  Among the documents that Dean Pulle and the Law School's Board of Directors prepared and released was a document entitled "Acquisition Profile and Initial Strategy For Regional Accreditation" dated October 1, 2009 ("Acquisition Profile").  The Acquisition Profile set forth intimate details about the Law School's plans and strategy, competitive challenges, financial affairs, cash flows, debts, faculty matters, contractual obligations, capital stock structure and its proposed terms for the sale of the Law School, including what the Dean and the Law School's Board of Directors perceived as a fair price for the shares of common stock held by the Law School's shareholders.  Pursuant to TCS's due diligence requests, the Law School provided the following:

(a) The Law School's By-Laws;

(b) Stockholder ledgers;

(c) Minutes of the Law School's Board of Director meetings;

(d) The Dean's Annual Report to the Law School's Board of Directors with detailed enrollment data for three years;

(e) An analysis of the Law School's financial condition with reference to the school's rent payments, cash on hand, ownership interests, and structure of administrative and faculty compensation (including actual dollar amounts);

(f) The Law School's Balance Sheet, including beginning and ending balances for the past three years, and the taxes paid on the school's revenues;

(g) Budgets and Profit & Loss Statements for 2009;

(h) Independent CPA Compilation Reports for fiscal years 2005, 2006, 2007 and 2008;

(i) U.S. corporate tax returns for three years for 2007, 2008, and 2009;

(j) A report of cash balances as of August 31, 2010;

(k) A marketing plan, including a pricing and competition analysis;

(l) A detailed description of the Dean's Compensation Package, including his retirement plan;

(m) Wage and salary information for staff and faculty;

(n) Employee contracts, including sample faculty contracts;

(o) Personnel files and personal academic biographies on faculty and administrative staff;

(p) Faculty and Student Policy Manuals;

(q) The Law School's real estate leases;

(r) State Bar Inspection Reports, including the Law School's responses to the comments made by the inspectors and follow-up correspondence with the State Bar; and

(s) Comprehensive State Bar annual registration filings that covered academic standing of all students, a report on drop-out rates, a budget for a library acquisition, faculty grading charts, a self-study completed by the Law School.

21.     Although the confidential nature of the foregoing documents is apparent, the importance of Dean Pulle's imprimatur on the materials and his frank discussion of everything he, the Board and faculty had considered -- past, present and future -- cannot be overstated.  For example, the documents related to the school's most recent State Bar inspection report are perhaps a law school's most sensitive and guarded Information.  While somewhat less detailed, the Law School's annual registration filing with the State Bar also covers many of the same topics.  These documents lay out, line by line, in elaborate detail, all the strengths and weaknesses (both real and perceived) of the Law School's operation, and give insight into an accrediting body's opinion on all facets of the school from basic curriculum to the governing Board's discharge of its solemn duties to the school's various constituencies.  The materials include the Law School's responses to those inquiries, addressing all of the State Bar's compliments, criticisms and recommendations.

22.     Dean Pulle candidly discussed with Figuli, Haynes and Keith, the Law School's strengths, weaknesses and strategic plans with an emphasis on how its partnership with TCS could be used to increase the Law School's competitive

advantage in the tri-county area.  As the NDA demands, TCS and Figuli were charged with maintaining and using all of the foregoing Information with "at least" the same care as the Law School's most trusted fiduciary.  The purpose of opening the Law School's books and granting unlimited access to TCS was to facilitate an acquisition of the Law School as the NDA expressly states.  The Law School had no reason to supply the Information for the purpose of facilitating TCS's affiliation with the Law School's sole competitor.  Had defendants even hinted at that possibility, the Law School would not have supplied the Information or candidly discussed its plans and strategy with TCS's representatives.

23.     On November 17, 2009, Dean Pulle met with Figuli, Haynes and Keith at the Law School's Ventura campus.  As part of meeting, the group toured the Santa Barbara campus, met with Vice Dean O'Neill and even a local Santa Barbara realtor regarding the potential purchase of the campus building.  During those discussions, the parties addressed the reconfiguration of the Law School's Board of Directors, the establishment of Joint Advisory Boards, and the hiring of additional faculty and new law deans, among other topics.  The gist of those discussions indicated that an acquisition of the Law School by TCS was imminent. Near the conclusion of the meeting, Haynes asked Keith, "What next..?"  Keith replied, "We make an offer."   Dean Pulle then asked Keith when he thought TCS would make an offer.  Keith and Figuli responded that it would be sent to the Law School no later than mid-December 2009.  Dean Pulle reported the results of the meeting, including the anticipated offer, to Vice Dean O'Neill and the Law School's Board of Directors.

24.     Later in the evening on November 17, 2009, Dean Pulle e-mailed Figuli and Haynes suggesting that TCS and the Law School engage in a follow-up discussion to address a few specific topics related to the acquisition, including such issues as changing the Law School's name, the composition of the new board of directors, the role of the current Board, and whether or not Figuli should serve on the newly reconstituted board.  On November 18, 2009, Figuli e-mailed Dean Pulle

COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

thanking him for his thoughts and confirmed these suggestions would be taken into account.

25.     The Law School did not receive any communication from TCS or Figuli in December 2009.  On January 21, 2010, Dean Pulle sent an e-mail to Figuli, with copies to Haynes and Keith, requesting a "status report" on the process toward an acquisition.  On January 22, 2010, Figuli e-mailed Dean Pulle, with copies to Haynes and Keith, stating as follows:

> "Stan, we appreciate you keeping us in mind.
>
> We were truly impressed with the remarkable accomplishments that you and your board have achieved in a very competitive environment.
>
> We believe that the reality of the situation at SCIL is that the achievements have been largely fueled by some rather extraordinary sacrifices on your part.  That has, in our opinion, and based on a very limited review, created a financial model that would be difficult to perpetuate.
>
> If we were to recast the financial results of SCIL to reflect a sustainable administrative and operational model, the results would not provide a basis for the type of 'ask' that your board has made.  Accordingly, it is our perception that an arrangement that would be acceptable to us would be very disappointing to your board.
>
> As a result of that analysis, we think it would be best for TCS to take a pass on the SCIL opportunity *at this time*."
>
> (italics omitted; emphasis added).

26.     TCS made no counter offer even though it received not only the price proposed by the Law School on or about October 1, 2009, but a written indication from Dean Pulle in that same communication and subsequently in the parties' discussions, that his Board would consider a lower amount and negotiate.  Prior to Figuli's January 22, 2010 e-mail, no one from TCS, including Figuli, Haynes or Keith, suggested that the Law School's proposed price was unacceptable or

unreasonable.   The last phrase in Figuli's e-mail that TCS would "pass on the SCIL opportunity at this time" left open the possibility that it was still considering a pending offer.  Dean Pulle conveyed that impression to his Board and certain faculty who had been involved in the negotiations.  This inference is further bolstered by the fact that paragraph 5 of the NDA obligates TCS upon termination of the "Relationship" to "promptly destroy" the Information and "certify" its destruction to the Law School.  Paragraph 7 of the NDA, further provides that: "Unless otherwise agreed, the Agreement shall continue until such time as any Information received by TCS hereunder is returned to the [Law School] or destroyed."  The Law School's documentary Information was neither destroyed nor returned and no certification of its destruction has been provided.  The Law School made no request for the return of the documentary Information given its belief (and hope) that further discussions with TCS might ensue.  Most fundamentally, it had no idea of defendants' intentions to misuse the Information and abuse the "Relationship" of trust and confidence created by the NDA and the parties' course of dealing.

27.     In violation of the NDA, their fiduciary duties owed to the Law School and applicable federal and state law, the defendants made a calculated decision to misuse the Law School's Information, conveyed both in documents and orally by Dean Pulle and Vice Dean O'Neill, as a means for acquiring the Law School's longtime rival, COL.  TCS, through its affiliation with COL, has now become the Law School's sole competitor with full knowledge of the Law School's most intimate and confidential information and trade secrets.  Haynes recently confirmed to Dean Pulle in a telephone conversation in late September 2010, that Figuli is still in possession of the Law School's documentary Information and that Figuli was involved in facilitating TCS's acquisition of COL.

28.     It may reasonably be inferred that defendants approached COL during the time they were engaged in discussions with the Law School or soon thereafter, but concealed their wrongful intent from the plaintiff.  This inference is supported

by the large gap in time between the November 17, 2009 meeting and Figuli's January 22, 2010 e-mail sent only hours after Dean Pulle inquired about why he had not heard anything further from TCS.   COL's Website confirms that TCS approached COL regarding the possible affiliation.   The defendants further admit in documents on their Websites that COL and TCS obtained approval from the State Bar's Committee of Bar Examiners for their affiliation in July 2010.   It takes a month or more to obtain such approval.   When one considers the time needed to conduct due diligence and negotiate their affiliation, it is reasonable to infer that defendants' initial contact with COL occurred contemporaneously with or soon after their discussions with the Law School.   The misuse of the Law School's Information is likewise apparent from these facts because defendants were bound to act with the highest of fiduciary standards toward the Plaintiff.   NDA ¶2. Having gained access to plaintiff's Information, the NDA restricted the defendants from using the Information other than to "facilitat[e] a transaction" with the plaintiff and effectively barred defendants from becoming the Law School's competitor because to do so would violate their contractual and fiduciary obligations.   *See* NDA ¶10 (TCS shall not "pursu[e] business opportunities or other arrangements or endeavors of any kind" in violation of the NDA).

29.   In other words, defendants' misconduct is worse than a case involving the misappropriation of a plaintiff's trade secrets.   The misconduct here is qualitatively different than using a stolen process or technology in another product, even a directly competing product or service.   Instead, defendants' theft is incidental; the harm is really TCS's misuse of the information to eliminate the Law School's ability to compete and put it out of business.   TCS effectively gave up the right to acquire COL once it obtained plaintiff's information in a fiduciary context. The NDA was drafted by TCS and it assumed the fiduciary role entirely on its own volition. The *sine qua non* of the Law School's release of its Information was TCS's fiduciary promise.   The essence of fiduciary responsibility is *candor*, *loyalty* and *safeguarding trust*.   Otherwise, deception and self-interest are likely outcomes

-- the antithesis of fiduciary law.  In the legendary words of the Honorable Benjamin N. Cardozo: "Many forms of conduct permissible in a workaday world for those acting at arm's length, are forbidden to those bound by fiduciary ties.  A trustee is held to something stricter than the morals of the market place. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior." *Meinhard v. Salmon*, 249 N.Y. 458, 464 (1928).

30.   The Law School first learned of defendants' wrongful conduct through news reports on or about September 22, 2010.  The press release, dated September 21, 2010, jointly published by TCS and COL and carried on their respective Websites and by various news services, including *Reuters* and the *Pacific Coast Business Times*, confirmed that TCS and COL entered into an affiliation agreement effective October 1, 2010.  Referring to COL as "the Central Coast's preeminent law school," the press release confirms that under its new leadership, COL, using TCS's expertise in regulatory affairs, plans to seek WASC accreditation which will bring access to federal student financial aid programs.  In the September 21, 2010, press release, COL Dean Heather Georgakis, is quoted as saying, "This affiliation will strengthen the law school and its long-term growth potential by adding new resources, generating economies of scale and creating new opportunities for law-related education."   Among the "new opportunities" planned by TCS and COL are adding online courses, additional law programs (as may be allowed by the State Bar), multi-disciplinary and joint programs in other disciplines within the expertise of TCS's affiliates, and access to advanced educational technology and academic support.   As part of the agreement, TCS will also provide administrative and student support services, marketing assistance, accounting and human resources. COL will continue to be governed by a board of trustees, but as COL's supporting entity, TCS will join with the trustees to create a "fiduciary council" that will meet annually to decide on major budget and strategic issues, including plans for COL's expansion.

COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

31.     In spite of defendants' betrayal and the harm inflicted on the Law School, plaintiff is primarily seeking injunctive relief to prevent TCS from taking any further steps to pursue the affiliation with COL rather than monetary damages. The plaintiff's greatest concern is preserving the opportunity for an underserved population of current and future students to attend the Law School.  Nearly twenty-five years of tireless efforts and sacrifice, as defendants themselves acknowledge, have yielded a wonderful community resource with an outstanding faculty, grateful and accomplished alumni, and a reputation of integrity and scholarship.  All of this is now placed in jeopardy by making it unlikely that the Law School will survive due to the defendants' misuse of the confidential Information, unlawful competition and other wrongdoing.  Until now, the Law School has successfully competed with rival COL by keeping its tuition low and offering what many view as the superior legal education.   With TCS's vast resources, including its marketing savvy, the Law School has no chance of continuing to differentiate itself successfully.  The defendants and COL have already begun marketing the affiliation as major advantage on their Websites and at Open Houses being held at COL's campuses during October and November of 2010.  On COL's Website under a heading entitled, "Frequently Asked Questions About Affiliation Between the Colleges of Law and TCS ES," COL states:

"What will TCS ES bring to the Law School and its students?

TCS ES will provide administrative support and services that are otherwise cost-prohibitive to a stand-alone institution the size of the Colleges.  The Colleges will be able to update and streamline operations in a variety of areas, including student services, academic support, marketing, accounting and human resources.  Students will benefit from the kind of improvements in campus technology that will allow them to mix onsite and online courses, learn in "smart" classrooms, use robust online course support software, and interact more easily with the Administration Office.  TCS ES will also provide

dedicated expertise in regulatory affairs, regional accreditation, and Title IV Federal financial aid.  And, through this affiliation the Colleges of Law will be better positioned to take our mission, expertise, and access to the study of law to new students as we expand our horizons and chart a course of growth and continued development."

32.     COL's rivalry with the Law School is both long-lived and often intense.  Only a few days ago, at an Open House held on October 19, 2010, COL's Assistant Dean Barbara Doyle emphatically discouraged prospective law students from attending the Law School exclaiming, "Oh no, no, no, that's our competitor, don't go there!"  Assistant Dean Doyle's presentation focused on the "advantages" of attending COL from the perspective of cost and the relative value of the anticipated education, based in part on TCS's affiliation, and argued that COL compared favorably to several other California law schools.  Notably absent from her presentation was any comparison to the Law School.

33.     With the combined resources of COL and TCS, however, it will be much more difficult, if not impossible, for the small Law School to compete.  With its present resources, the Law School cannot possibly offer the services promised by COL to current and prospective students or match TCS's likely administrative and technological innovations.   In addition, TCS's affiliation with COL has reduced the likelihood to *nil* that the Law School might be perceived as an attractive acquisition candidate to another large education organization.  This is so because competition in the tri-county area will be much more expensive and challenging.

34.     Not only is TCS-COL wealthy and resource rich, they are armed with the Law School's misappropriated Information and best strategic thinking of its deans, faculty and Board placing the Law School at a distinct competitive disadvantage.   To the extent the Law School's confidences reveal strengths, TCS and COL can now use the information to emulate the Law School's strengths.  To

the extent the misappropriated Information reveals the Law School's weaknesses, they can direct their efforts at exploiting those weaknesses.  Additionally, by unlawfully using its market power, TCS is in a position to poach on current and future students of the Law School through the promise of federally funded tuition loans.  This is even more of a threat in light of the current tight credit market.

35.     By contrast, had TCS sought to compete fairly, even with its wealth and resources, it would be a relatively weak competitor if it were to try and start a law school on its own.  The barriers to entry in California for new law schools are considerable, including the likelihood of a decade or more of effort to achieve State Bar accreditation.   In addition to the lesser status accorded unaccredited schools, first year students are required to take and pass the "Baby Bar" (formally, the "First Year Law Students' Examination-FYLSX") before they can move ahead in school.  The pass rate on this exam is usually only 10 to 15 percent which can be devastating financially to a new law school given the high attrition rate.  This is the main reason why TCS sought to acquire an existing school -- a key point Figuli and other TCS representatives discussed with Dean Pulle.

36.     The Law School has competed successfully with COL for many years and welcomes increased opportunities for all students, particularly those who might benefit from access to student loans and improvements in the educational process.  These are all good things in the abstract.  But the law should not condone wrongdoing even if the wrongdoing may create social good for some. To do otherwise is Machiavellian.  Without injunctive relief, the Law School will lose the ability to compete, suffer a downturn in its enrollment and may go out of business. Working class students and the Law School's dedicated faculty and administrative staff will all fall victim to defendants' wrongdoing masquerading as "social impact" and progress.   Injunctive relief levels the playing field allowing TCS and COL to continue to do business as they did before TCS misappropriated all of the plaintiff's most closely guarded secrets to gain an unfair competitive advantage.

## AGENCY ALLEGATIONS

37.    Each of the defendants was the agent of the other defendants in regard to all events and actions described herein and acted within the course and scope of such agency at all relevant times.

## CONSPIRACY ALLEGATIONS

38.    Defendants, and each of them, agreed and knowingly and willfully conspired to facilitate and enter into the COL affiliation.

39.    In order to further and effectuate this conspiracy, defendants, and each of them, misused and misappropriated plaintiff's Information and trade secrets, breached their fiduciary duties to the plaintiff, as further alleged below, concealed and misrepresented material facts, engaged in unfair competition and committed other unlawful acts.  Defendants' wrongdoing is continuing as they move forward with the COL affiliation.

40.    Defendants' acts were done with the full knowledge and consent of each of them and caused injury to the plaintiff, including, the imminent threat of irreparable harm.

## FIRST CLAIM FOR RELIEF

### (Breach Of Contract Against TCS)

41.    Plaintiff hereby repeats, realleges and incorporates by reference the allegations which are contained in paragraphs 1 through 40, above.  This first claim for relief is alleged against defendant TCS.

42.    The NDA is a valid and enforceable contract. The fiduciary obligations, confidentiality covenants and other provisions contained therein were and are reasonably necessary to protect plaintiff's legitimate interests in safeguarding its trade secrets, confidential information, financial data, faculty and employee relationships and competitive standing.

43.    Plaintiff fully performed all of its obligations under the NDA except for those that have been discharged or excused by defendant's prior breaches or other wrongful acts.

COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

44.     TCS is breaching or threatens to breach the NDA in at least the following ways:

        (a)  Keeping the Information, as defined in the NDA, in its possession;

        (b) Misusing the Information, documentary and otherwise, to compare the Law School to COL, facilitate its affiliation transaction with COL and obtain an unfair competitive advantage over the plaintiff;

        (c)  Refusing to certify the destruction of the Information;

        (d)  Failing to protect the confidentiality of the Information in at least the same manner as a fiduciary of the Law School would do;

        (e) Violating its covenant not to compete against the Law School by using the Information it obtained pursuant to the NDA to pursue an affiliation with COL.

45.     As a direct and proximate result of any one or all of these breaches, plaintiff has been injured and faces irreparable harm.   Plaintiff is threatened with losing students, its competitive advantage, trade secrets and goodwill in amounts which may be impossible to determine, unless TCS is enjoined and restrained by order of this Court.

46.     Alternatively, plaintiff has suffered actual damages in an amount that exceeds $75,000, which plaintiff will prove at the time of trial.  In addition, defendants have been unjustly enriched to the extent that they are profiting unfairly from their use of plaintiff's confidential Information and trade secrets and their violation of the non-competition covenant.

## SECOND CLAIM FOR RELIEF

### (Breach Of Implied Covenant Of Good Faith And Fair Dealing Against TCS)

47.     Plaintiff hereby repeats, realleges and incorporates by reference the allegations which are contained in paragraphs 1 through 46, above.  This second claim for relief is alleged against defendant TCS.

48.     By its express terms the NDA is governed under California law.  As such, the NDA contains an implied covenant of good faith and fair dealing that

required TCS to do nothing to deprive the plaintiff of the benefits of the NDA. The implied covenant of good faith and fair dealing also obligated defendant to do everything that the NDA presupposes that it had to do to accomplish its purpose.

49.     TCS breached the implied covenant of good faith and fair dealing when it failed to return or certify the destruction of the plaintiff's documentary Information and used such Information and the other confidential data and trade secrets plaintiff orally conveyed to it for the purpose of facilitating its affiliation transaction with TCS.  In addition, TCS promised directly or indirectly that it would not pursue a transaction with plaintiff's competitor and in doing so breached the implied covenant.

50.     Plaintiff fully performed all of its obligations under the NDA except for those that have been discharged or excused by defendant's prior breaches or other wrongful acts.

51.     As a direct and proximate result of TCS's acts and breaches of the implied covenant of good faith and fair dealing implied in the NDA, plaintiff has been injured and faces irreparable harm.    Plaintiff is threatened with losing students, its competitive advantage, trade secrets and goodwill in amounts which may be impossible to determine, unless TCS is enjoined and restrained by order of this Court.

52.     Alternatively, plaintiff has suffered actual damages in an amount that exceeds $75,000, which plaintiff will prove at the time of trial.

### THIRD CLAIM FOR RELIEF

**(Breach Of Fiduciary Duty and Aiding And Abetting Against All Defendants)**

53.     Plaintiff hereby repeats, realleges and incorporates by reference the allegations which are contained in paragraphs 1 through 52, above.  This third claim for relief is alleged against all defendants.

54.     By reason of TCS's obligations under the NDA to act in a fiduciary capacity and the course of dealing between the parties whereby the plaintiff was encouraged to repose trust and confidence in the defendants, defendants owed

plaintiff fiduciary obligations of due care, candor, compliance, fidelity, trust, loyalty, obedience and good faith.  Defendants, and each of them, occupied a special relationship to the plaintiff by virtue of the parties' contractual agreement and course of dealing.  Defendants were privy to confidential and proprietary Information concerning the plaintiff, its operations, material contracts, future prospects and financial condition.   Defendants were allowed access to plaintiff's confidential Information and secrets based on their solemn promise that they would exercise the utmost good faith and care in their dealings with the plaintiff.

55.    In discharging their fiduciary duties, defendants were required to treat plaintiff in a fair, equitable and just manner and refrain from doing anything detrimental to the plaintiff's interests.  In addition, having obtained the plaintiff's Information and secrets and committed to only using same for the purpose of acquiring plaintiff, defendants could not use the Information and secrets in a manner that would benefit themselves at plaintiff's expense.  By virtue of the fiduciary duties owed to the plaintiff, defendants were precluded from competing with the plaintiff and/or affiliating with COL, plaintiff's longtime competitor.

56.    Defendants breached these duties by misusing plaintiff's Information and secrets, engaging in unfair competition with the plaintiff and/or affiliating with plaintiff's rival.

57.     In discharging their fiduciary duty of candor, the defendants were required to ensure that they were accurate and truthful and did not conceal or misstate material facts.  Defendants breached their fiduciary duties of candor by concealing their dealings with COL and failing to negotiate with the plaintiff in good faith.

58.    The defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions, each defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing and was aware of his or its overall contribution to and in furtherance of the wrongdoing.

COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

59.     As a direct and proximate result of defendants' breaches of their fiduciary duties of loyalty, good faith, due care and candor, and aiding and abetting those breaches, and other misconduct, plaintiffs has been injured and faces irreparable harm.  Alternatively, plaintiff sustained and continues to sustain significant damages in an amount to be proven at trial.

60.     In failing to properly discharge their fiduciary duties, the defendants, singly and in concert, engaged in the aforesaid misconduct in intentional breach and/or reckless disregard of their duties to the plaintiff.

61.     Further, defendants pursued such course of conduct intentionally and maliciously with the intention of furthering their own economic interest at the expense of plaintiff.  By reason of these wrongful acts, plaintiff is entitled to an award of punitive and exemplary damages against the defendants.

## FOURTH CLAIM FOR RELIEF

### (Negligent Misrepresentation Against All Defendants)

62.     Plaintiff hereby repeats, realleges and incorporates by reference the allegations which are contained in paragraphs 1 through 61, above.  This fourth claim for relief is alleged against all defendants.

63.     From the moment they first made contact with the plaintiff, defendants knew that there were only two law schools in the tri-county region. From the outset of the parties' discussions, defendants represented to the plaintiff that they intended to become plaintiff's ally and compete with COL.  The collaboration between TCS and the Law School was explored in depth with the specific goal of creating a strong competitive alliance against COL.  Throughout the course of the parties' discussions, defendants represented that they intended to acquire the Law School.  These affirmative representations carried an implied promise and representation that defendants would not pursue an affiliation with COL.  In reliance on the defendants' expressed and implied representations, the Law School agreed to the NDA and provided defendants with complete access to its confidential Information and trade secrets, including, but not limited to, its

monthly bank statements, cash on hand, Profit and Loss statements, State Bar inspection reports, prior self-studies, Board of Directors Minutes, administrative and faculty compensation structures, strategies for new degree programs and curriculum development, student profiles, recruitment strategies, budgets and strategic plans.

64.    Prior to obtaining plaintiff's confidential Information and secrets, defendants had a duty to disclose to the Law School that they might explore an acquisition of plaintiff's rival and would consider competing with plaintiff if an agreement to acquire the Law School was not reached.  Defendants had a further duty to inform the plaintiff that they intended to open discussions with COL so that plaintiff could act to safeguard its rights and seek to prevent the affiliation. Instead, defendants concealed their true intentions and the foregoing material information from the plaintiff causing the plaintiff to suffer injury.

65.    Defendants made the foregoing materially misleading statements and omissions without reasonable grounds for believing them to be true.

66.    Defendants intended to induce and did induce the plaintiff to rely on their misrepresentations in agreeing to provide the confidential Information and secrets and refrain from taking action to protect its rights and business interests.

67.    Plaintiff was unaware of the falsity of the foregoing misstatements and omissions and justifiably relied on them.  Had plaintiff known the true facts, it would not have agreed to provide its confidential Information and secrets to defendants and would have brought suit to enforce its rights, including seeking appropriate injunctive and declaratory relief.

68.    As a direct and proximate result of defendants' misrepresentations and omissions, plaintiff suffered injury and substantial damage.  Plaintiff does not have an adequate remedy at law to protect its interests and therefore seeks preliminary and permanent injunctive relief.

COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

**FIFTH CLAIM FOR RELIEF**

**(Misappropriation Of Trade Secrets Against All Defendants)**

69.     Plaintiff hereby repeats, realleges and incorporates by reference the allegations which are contained in paragraphs 1 through 68, above.  This fifth claim for relief is alleged against all defendants.

70.     At all relevant times, plaintiff was in possession of confidential and trade secret information as defined by California Civil Code §3426.1(d).  The proprietary business information of plaintiff constitutes trade secrets because plaintiff derives independent economic value from that information, such Information is not generally known nor readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use, and because the information is the subject of reasonable efforts to maintain its secrecy.  Plaintiff's confidential and proprietary trade secret information described herein is not and was not generally known to TCS, COL or any other actual or potential competitors.

71.     Plaintiff is informed and believes and therefore alleges that defendants have actually misappropriated and/or threaten to misappropriate plaintiff's trade secrets without plaintiff's consent in violation of California's Uniform Trade Secrets Act ("CUTSA"), California Civil Code §3426, *et seq*.  By affiliating with COL, TCS is now in a competitive relationship to the plaintiff and is using or will in the near future use plaintiff's trade secrets and confidential information.  TCS cannot separate out plaintiff's trade secrets and confidential information in pursuing their affiliation with COL.  As such injunctive relief, pursuant to Civil Code §3426.2(a) is appropriate.

72.     Due to their contractual and fiduciary relationship with plaintiff, defendants gained access to plaintiff's most valuable trade secrets and confidential information.  Defendants continue to have knowledge of that information, notwithstanding the fact that TCS is now affiliated with COL and is competing with plaintiff.

COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

73.     Plaintiff is informed and believes and thereon alleges that defendants intend to disclose plaintiff's trade secrets and confidential information to others, including persons employed by COL, in violation of the CUTSA and the NDA.

74.     As a proximate result of defendants' actual and threatened misappropriation of plaintiff's trade secrets and confidential information, plaintiff has suffered, and will continue to suffer, actual damages in an amount to be proven at the time of trial, but which are substantial and in excess of the minimum jurisdictional amount of this Court.  Defendants have further been unjustly enriched due to their ability to use the misappropriated confidential information and secrets as means of planning a marketing strategy with the goal of luring current and prospective students away from the plaintiff.

75.     As a proximate result of defendants' wrongful conduct and threatened misappropriation, plaintiff has been injured, irreparably and otherwise, and is threatened with the loss of its competitive advantage, goodwill and confidential information and trade secrets in amounts which may be impossible to determine, unless defendants are enjoined and restrained by this Court.  Unless restrained, defendants will continue to threaten to use, actually use, divulge, threaten to disclose, acquire and/or otherwise misappropriate plaintiff's trade secrets and confidential information.

76.     Defendants' actual and threatened misappropriation is willful and malicious and their deliberate violation of the NDA's contractual obligations.  Therefore, plaintiff is entitled to an award of exemplary damages and attorneys' fees and costs pursuant to California Civil Code §§3426.3(c) and 3426.4.

## SIXTH CLAIM FOR RELIEF

### (Attempted Monopolization In Violation Of § 2 Of The Sherman Antitrust Act Against TCS)

77.     Plaintiff hereby repeats, realleges and incorporates by reference the allegations which are contained in paragraphs 1 through 76, above.  This sixth

claim for relief is alleged against TCS for its attempted monopolization in violation of section 2 of the Sherman Antitrust Act of 1890 ("Sherman Act"), 15 U.S.C. § 2.

78.     The relevant product and services market is evening law schools. Evening law schools affect interstate commerce in that, among other things, the schools use instrumentalities of interstate commerce to advertise and market themselves, enroll students who come to California from other states for the purpose of attending the schools and graduates from the schools sometimes pursue careers in other states.  As alleged above, substantial barriers to entry exist in the relevant market, including the delay and expense in obtaining State Bar accreditation and the loss of revenue due to the attrition rate of students in unaccredited schools.  There are no day time law schools in the relevant market and none exist in the relevant geographic region.

79.     The relevant geographic market is the California tri-county region of San Luis Obispo, Santa Barbara and Ventura Counties, home to approximately five million people.  The geographic market is based on, among other factors, the long commuting distance to other law schools in Northern and Southern California, the types of students who avail themselves of evening law school programs, and the tuition and other costs associated with obtaining a law school education.

80.     Based on the approximate amount of current students attending COL and the Law School, COL has a current estimated market share of 71% and the Law School has 29%.  Through their affiliation agreement, TCS and COL will have monopoly power in the relevant market and geographic area to control tuition prices and exclude competition.

81.     As alleged above, TCS has committed various acts of wrongdoing in a deliberate attempt to drive the Law School out of the evening law school market. In meetings between the Law School and TCS, the issue of the Law School's low tuition was repeatedly discussed.  The Law School maintained that it needs to keep its tuition low in order to accomplish its mission of providing students a law school education without financing a large sum of money and incurring high debt.  An

affordable legal education, especially for those in the low and middle income economic brackets, is a paramount concern of the plaintiff's.  During the parties' discussions, TCS inquired about increasing tuition, asked what the market would bear, and knew that tuition at the Law School was $100 less per unit than at the COL.  Upon information and belief, TCS and Figuli evaluated the confidential information and secrets they wrongfully obtained from the Law School and concluded that their ability to raise tuition would be vastly enhanced if they pursued an affiliation with COL and eliminated the Law School as a competitive threat using monopoly power.  It did so intentionally with the goal of eliminating consumer choice of law schools and maximizing profits.

82.     TCS's efforts to drive plaintiff from the evening law school market constitutes attempted monopolization in violation of §2 of the Sherman Act.  TCS has combined and conspired with COL and others in furtherance of its efforts to monopolize the relevant market for evening law schools.

83.     But for TCS's affiliation with COL and its other wrongdoing, plaintiff could have enhanced competition by offering more services and making other improvements while keeping its tuition prices low.  As a result of the affiliation agreement between TCS and COL, the price of evening law school tuition in the tri-county region will increase.  If the Law School goes out of business, students will have only one choice.  The plaintiff has been injured in its business and property by the threat of losing current and prospective students.  As direct result of TCS's anticompetitive actions, competition in the market for evening law school programs has been restrained.

84.     Plaintiff requests that injunctive relief be granted preventing the TCS-COL affiliation from being pursued.  Alternatively, plaintiff will seek actual damages in an amount to be proven at trial.

COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

## SEVENTH CLAIM FOR RELIEF

### (Monopolization In Violation Of §2 Of The Sherman Act Against TCS)

85.    Plaintiff hereby repeats, realleges and incorporates by reference the allegations which are contained in paragraphs 1 through 84, above.  This seventh claim for relief is alleged against TCS for its monopolization in violation of section 2 of the Sherman Act, 15 U.S.C. § 2.

86.    TCS has engaged in the wrongdoing alleged above in a deliberate attempt to drive the Law School from the market for evening law school services.

87.    By virtue of its affiliation with COL, TCS has monopoly power in the market for evening law schools in the relevant geographic area.  TCS's efforts to drive the Law School from the market constitutes monopolization in violation of §2 of the Sherman Act.

88.    TCS willfully acquired, maintained and/or extended its monopoly in the evening law school market by its acts and practices described herein, including by implementing its affiliation with COL.

89.    As a proximate result of TCS's unlawful conduct, plaintiff has sustained damages in an amount presently unknown.  Plaintiff requests that injunctive relief be granted preventing the TCS-COL affiliation from being pursued.  Alternatively, plaintiff will seek actual damages as may be proven at trial.

## EIGHTH CLAIM FOR RELIEF

### (Conspiracy To Monopolize Against All Defendants)

90.    Plaintiff hereby repeats, realleges and incorporates by reference the allegations which are contained in paragraphs 1 through 89, above.  This eighth claim for relief is alleged against defendants for their conspiracy to monopolize in violation of section 2 of the Sherman Act, 15 U.S.C. § 2.

91.    Defendants, and each of them, consciously entered into and engaged in a contract, combination or conspiracy beginning at least as early as January 2010, to monopolize the evening law school market in the relevant geographic

COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

area.  Prior to the affiliation between TCS and COL, the Law School and COL were actual competitors in the evening law school market.  Defendants conspired with specific intent, knowledge and purpose that their anticompetitive agreement would result in TCS willfully acquiring and maintaining a monopoly in the evening law school market.  Defendnats knew that the natural and probable consequence of the affiliation agreement between would be the monopolization of the evening law school market by TCS and COL. To effectuate their contract, combination or conspiracy, defendants did those things they combined and conspired to do, including misappropriating plaintiff's confidential information and trade secrets for the purpose of monopolizing the relevant market and entering into the affiliation agreement.

92.    As a proximate result of TCS's unlawful conduct, plaintiff has sustained damages in an amount presently unknown.  Plaintiff requests that injunctive relief be granted preventing the TCS-COL affiliation from being pursued.  Alternatively, plaintiff will seek actual damages as may be proven at trial.

## NINTH CLAIM FOR RELIEF

### (Violation Of The Cartwright Act Against All Defendants)

93.    Plaintiff hereby repeats, realleges and incorporates by reference the allegations which are contained in paragraphs 1 through 92, above.  This ninth claim for relief is alleged against defendants for their violation of the Cartwright Act, California Business & Professions Code §§ 16720, *et seq*.

94.    Since in or before January 2010 and up to the present time, defendants conspired, and agreed and continue to combine, conspire and agree to unreasonably restrain and monopolize the evening law school market, in violation of the Cartwright Act, by signing, or causing TCS and COL to sign, the affiliation agreement.

95.    As a direct consequence of the agreement, competition in the market has been restrained, suppressed and will likely be eliminated.  Students have and

will be deprived of the benefit of a free, competitive marketplace for evening law schools in the relevant geographic area.

## TENTH CLAIM FOR RELIEF

### (Violation Of The Unfair Competition Law Against All Defendants)

96.     Plaintiff hereby repeats, realleges and incorporates by reference the allegations which are contained in paragraphs 1 through 95, above.  This tenth claim for relief is alleged against defendants for their violation of the Unfair Competition Law, California Business & Professions Code §§ 17200, *et seq*.

97.     Defendants have engaged in and are still engaged in acts of unfair competition, as defined in California Business & Professions Code §§ 17200, *et seq*., including, but not limited to violation of the Sherman Act, 15 U.S.C. §2, California's Uniform Trade Secrets Act ("CUTSA"), California Civil Code §3426, *et seq*., and the Cartwright Act, California Business & Professions Code §§ 16720, *et seq*., as alleged above.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays judgment against defendants, and each of them, as follows:

1.     For a preliminary and permanent injunction enjoining defendants, their officers, directors, managers, employees, agents, affiliates and all persons acting under, in concert with, or for them:

(a)  From taking any further steps to pursue or implement an affiliation with COL, including prohibiting them from taking any steps to obtain WASC accreditation, providing financial, administrative, technological or other forms of support to COL, ceasing any further marketing or publication of the affiliation, and removing the September 21, 2010 joint TCS-COL press release and any further reference to the affiliation from their Websites and in any publicly-available documents; and

(b)  From using or disclosing, directly or indirectly, plaintiff's trade secrets and confidential information.

2. That the affiliation agreement between TCS and COL be declared null and void and of no further effect;

3. That the defendants be adjudged to have violated the Sherman Act, CUTSA, Cartwright Act and the Unfair Competition Law;

4. For actual and compensatory damages in an amount to be proven at trial;

5. For disgorgement of any unfair profits and/or unjust enrichment;

6. For exemplary and/or punitive damages;

7. For plaintiff's costs of suit including their reasonable attorneys' fees;

8. For prejudgment and post judgment interest; and

9. For such other and further relief as the Court deems just and proper.


DATED: October 25, 2010          THE LAW OFFICES OF GEORGE A. SHOHET,
                                 A PROFESSIONAL CORPORATION

                                 KREINDLER & KREINDLER LLP


                                 By: _____
                                    GEORGE A. SHOHET
                                    Attorneys for Plaintiff
                                    Southern California Institute of Law

COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

1

## **JURY TRIAL DEMAND**

2

Plaintiffs hereby demand a trial by jury in this matter.

3

4    DATED: October 25, 2010          THE LAW OFFICES OF GEORGE A. SHOHET,
                                      A PROFESSIONAL CORPORATION

5

6                                     KREINDLER & KREINDLER LLP

7

8

9    By: _____

10                                    GEORGE A. SHOHET
                                      Attorneys for Plaintiff
11                                    Southern California Institute of Law

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

# EXHIBIT 1

# TCS EDUCATION SYSTEM

## CONFIDENTIALITY AND NON-DISCLOSURE AGREEMENT

**THIS AGREEMENT** is made as of the 24th day of September, 2009,

**BETWEEN**

**TCS Education System**

**(hereinafter referred to as "TCS")**

-and-

**Southern California Institute of Law**

**(hereinafter referred to as "SCIL")**

**WHEREAS** for the purposes of facilitating a transaction (the "Relationship") between TCS and SCIL, the parties will provide access to proprietary, trade secret and confidential information to the other, which may include, without limiting the generality of the foregoing, strategies and strategic plans, business opportunities, business plans, financial reports, statements and projections, trade names and marks, documents, programs, techniques, know-how, and specifications (all such documents and items, including any copies, reproductions or derivations thereof or therefrom shall hereinafter be referred to as "Information").

**THEREFORE THIS AGREEMENT WITNESSES** that, in consideration of the Relationship and of the mutual covenants hereinafter contained, the parties hereto agree as follows;

1.      The Information, and all rights, title and interest thereto, shall remain the property of the party providing it ("Disclosing Party"). The receiving party ("Receiving Party") shall not use, reproduce, or directly or indirectly disclose or allow access to the information except as required to facilitate the Relationship.

2.      The Receiving Party shall protect the confidentiality of the Information from the date of its receipt hereunder with at least the same diligence and care as would be required of Receiving Party if it were a fiduciary of the Disclosing Party, that is the utmost good faith and care for the interests of the Disclosing Party.

3.      The Receiving Party shall disclose the Information only to those of its own agents or employees who require the Information for the purpose of the Relationship. Prior to disclosing the Information to its own agents or employees, the Receiving Party shall issue appropriate instructions to satisfy its obligations under this Agreement. The Receiving Party, however, will remain fully liable for any breach of its obligations caused by the actions or omissions of any of its agents or employees.

4.      The Receiving Party may provide to any of its subsidiaries or its parent, Information only upon obtaining the written consent of the subsidiary and/or parent to the same terms and conditions contained in this Agreement. The Receiving Party shall give to the Disclosing Party an executed copy of each such consent.

5.      Upon termination, for any reason, of the Relationship, or upon the request of the Disclosing Party, the Receiving Party shall promptly destroy and certify the destruction to the Disclosing Party of all Information belonging to the Disclosing Party and copies thereof susceptible of being destroyed. To "destroy" in the case of electronic data shall mean to remove without the ability to recall or recover such data from all storage media under the control of the Receiving Party or any party to whom the Information was disclosed.

Exhibit 1

# TCS EDUCATION SYSTEM

## CONFIDENTIALITY AND NON-DISCLOSURE AGREEMENT

6.     Neither party shall be liable for disclosure of the Information upon the occurrence of one or more of the following events:

(a)  the Information enters the public domain other than through a breach of this Agreement;

(b)  the Information is subsequently lawfully obtained by the Receiving Party from a third party or parties under circumstances that do not involve a breach of this Agreement or the legal rights of the Disclosing Party; or

(c)  the Information is disclosed in compliance with any applicable law or regulation that mandates its disclosure, provided that the Disclosing Party is given prompt notice of such any demand for or required disclosure.

7.     Unless otherwise agreed, this Agreement shall continue until such time as any Information received by Receiving Party hereunder is returned to the Disclosing Party or destroyed.

8.     This Agreement shall be governed and interpreted in accordance with the laws applicable in the State of California.

9     If any provision or any part of any provision of this Agreement is held to be unenforceable, invalid or illegal, then it shall be severable and deemed to be deleted and the remaining provisions shall remain valid and binding.

10.    Notwithstanding anything in this Agreement to the contrary, nothing in this Agreement shall be deemed to inhibit or prohibit either party from pursuing business opportunities or other arrangements or endeavors of any kind so long as the terms and provisions of this Agreement are maintained inviolate.

11.    This Agreement supersedes and replaces all existing agreements between TCS and SCIL relating generally to the subject matter hereof.  It may not be modified or terminated, in whole or in part, except in writing signed by both parties.

**IN WITNESS WHEREOF** the parties have caused this Agreement to be executed on the date first above written.

**TCS EDUCATION SYSTEM**

BY: _____

**SOUTHERN CALIFORNIA INSTITUTE OF LAW**

BY: _____

Exhibit 1